# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 3, 2005 Session

## STATE OF TENNESSEE v. JERRY DALE TIGNER, JR.

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-08463    Chris Craft, Judge**

_____

**No. W2004-01935-CCA-R3-CD  - Filed September 15, 2005**

_____

The defendant, Jerry Dale Tigner, Jr., was indicted for second degree murder, a Class A felony, and was convicted by a jury as charged and sentenced as a Range I, violent offender to seventeen years in confinement. The defendant appeals his conviction and sentence, claiming that: (1) the evidence is insufficient to support the conviction; (2) the sequential jury instructions on second degree murder and voluntary manslaughter are unconstitutional; (3) the trial court erred in sentencing by failing to consider all mitigating factors; and (4) the State committed <u>Brady</u> violations with regard to a witness. Upon review, we find no reversible error and affirm the conviction and sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID H. WELLES, J., joined.

C. Anne Tipton, Memphis, Tennessee, for the appellant, Jerry Dale Tigner, Jr.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lance E. Webb, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case concerns the fatal shooting by the defendant of the victim, Lawrence Bowles, at the defendant's rural home in Shelby County on May 18, 2002. Witnesses present at the time of the shooting were the defendant's brother, David Tigner; Charles Wood; Robert "Robbie" Rogers; Adam Whitehead; and Lawrence Bowles.

Robert Rogers described himself as a close friend of the defendant, having known him for twelve years. Rogers stated that the defendant's mother had taken him in when his own mother expelled him from their home. At some point after the defendant woke up on May 18th, he discovered a necklace was missing from his room. The defendant announced to the group that if the

necklace was not returned by 3:00 p.m., he was going to shoot someone. Rogers suspected the victim had the necklace and confronted him, telling him to return the necklace. The defendant and the remainder of the group came from the defendant's bedroom and had the victim sit on the couch. Eventually, the victim emptied his pockets, revealing the necklace and other stolen items. Rogers said the defendant was very upset. The defendant had an old revolver and was pointing it at the victim, saying he would shoot the victim's kneecap, his leg, and his nose. The defendant was pointing the gun, mainly at the victim's face and head, and sometimes waving the gun around. The defendant punched the victim in the head repeatedly with the weapon, but it did not fire at that time. The defendant had cocked the hammer on the revolver, and several of the witnesses asked him at various times to uncock it. Rogers stated that the victim had no weapon and did not threaten the defendant. Rogers heard the shot but was not looking at the defendant at the time. He said the defendant did not attempt to render any assistance to the victim but proposed that the witnesses agree that the victim lunged at the defendant with a knife. The defendant was crying and upset at the time. The defendant did call 911 after ten minutes. David Tigner placed a knife in the victim's hand, using gloves to handle the knife. When Rogers was later questioned by officers, he said he attempted to maintain the concocted story but broke down and told the truth.

The defendant's brother, David Tigner, said he arrived with Adam Whitehead at the defendant's residence about noon on May 18th. He stated that he had known the victim for a few weeks after meeting him in church. The defendant befriended the victim by providing the victim with meals and clothing and by allowing him to stay at his home on occasions. The witness said that after the defendant discovered the necklace was missing, he became "irritated," then "upset." The defendant began waving a revolver around and cocked and uncocked it two or three times. The witness estimated that approximately twenty minutes elapsed from the defendant's announcement of the missing necklace until the shooting. He denied hearing the defendant threaten to shoot the victim's nose off. The witness had looked away from the defendant when he heard the shot fired. He stated that there was no organized effort to concoct a story about the victim attacking the defendant. The witness said that he told Adam Whitehead to bring him gloves and that he put the knife in the victim's hand without the defendant's knowledge.

Brett Simonsen, a Shelby County deputy and patrol officer, was on patrol with Officer Heath Mains on May 18th. The deputies were instructed to go to the crime scene and were the first officers to arrive. Officer Simonsen stated that several men were outside the house. The defendant stood and said that he was the shooter and that he did not mean to shoot him, but the victim came at him with a knife. The officers went inside and viewed the deceased. Officer Simonsen noted the victim's pockets were turned out and a knife was beside his right hand.

Officer Mains testified that when he and Officer Simonsen approached the men assembled outside the defendant's residence, the defendant stated that he did not mean to shoot the victim but that the victim had a knife. Officer Mains described the defendant as upset and said he was sobbing.

Sergeant Richard Almond, a Shelby County Sheriff's Deputy, was at the crime scene some three hours after investigators had left. Adam Whitehead was brought back to the scene and consented to a search of the trunk of his car. Sgt. Almond found a pair of black gloves in the trunk.

The defendant was interviewed by Lieutenant Drewry and Sergeant Wright on the evening of May 18th. In that statement, the defendant related that he had met the victim in church and that the victim lived in a homeless shelter. The defendant stated that he noticed when he woke up the morning of May 18th that his necklace and some money were missing. When the victim emptied his pockets and the defendant saw the necklace, the defendant said he accidentally shot the victim. The defendant was asked if the victim was armed, and this exchange occurred:

Q. Okay and we found a knife in his hand. Where did that come from?

A. I don't know about the knife. I really don't know about the knife.

Q. Do you know anything about a knife that . . .

A. I mean he was reaching down like this. I didn't see him just, I mean you know, I'm trying to think. I can't just remember seeing him pull out no knife at me like this. I mean I don't think anybody, you know, would be that dumb and pull out.

Q. So, what you're saying you didn't shoot him because he came at you with a weapon?

A. Well I didn't know. He was coming at, you know, coming out of his pockets. And when I tried to back up I guess that pistol just got a hair trigger on it. I hit the back of the table and I started freaking out, you know, started freaking out.

The defendant said that he and the others went outside the house after the shooting and that he did not see anyone go back inside. He also stated that his brother, David Tigner, did tell him about placing the knife in the victim's hand.

Dr. Teresa Campbell, a forensic pathologist and Assistant Medical Examiner for Shelby County, went to the crime scene and later performed an autopsy on the victim. She stated there was a single gunshot wound to the victim's right eye, which was the cause of death. She observed stippling on the skin of the eyelid, on the forehead, and on the right cheek, indicating the handgun was fired within two to three feet of the victim or closer.

Heath Barker, a forensic scientist specializing in firearms and employed as a special agent for the TBI, testified concerning his examination of the defendant's handgun. He described the weapon as a revolver., .22 long rifle type. Testing revealed that the weapon had a trigger malfunction which caused it to not fire at times when in the single action mode. A trigger-pull test was conducted to determine the amount of pressure required to fire the weapon. The pressure required to fire this weapon when cocked was approximated to be two and one-half pounds. Normal for modern handguns is three to three and one-half pounds in single action mode. Agent Barker classified this trigger pull as a "light trigger." He stated that a "hair trigger" is one that requires less than one pound of pressure.

Adam Whitehead testified on behalf of the defendant. He said he was a long time friend of the defendant. Whitehead and David Tigner arrived at the defendant's residence about midday on May 18th. The defendant discovered his necklace was missing when he awoke. The defendant became very upset when the victim emptied his pockets. The witness stated that he did not see the defendant raise and aim the gun at the victim nor did he see the defendant fire the gun. Whitehead stated that there was no conversation about concocting a story to relate to the police. On cross-examination, the witness was confronted with the statement he had given to the police on May 18th. In that statement he related that there was a discussion about a knife and that the defendant may have suggested putting the knife in the victim's hand. Whitehead contended that he could not now remember the defendant making such a suggestion. Whitehead did recall David Tigner exiting the house and handing him some gloves, which he placed in his car trunk.

Charles Wood, the defendant's cousin, shared the residence with the defendant. He stated that the defendant became upset concerning his missing necklace. He saw the defendant standing in front of the victim, berating him for stealing. The defendant was waving the gun around, and Wood observed him cock and uncock it several times. The defendant was not aiming the gun but was looking at Wood when the shot was fired. He stated that all present went outside after this. He did not remember any discussion of a concocted story to relate to police nor did he recall anyone going back inside the house after the shooting.

On cross-examination, Wood read his statement given to police on the day of the shooting. In the statement, he related that he was in the hallway out of visual contact when the gun was fired. He entered the living room where he saw the victim slumped back and the defendant put the gun to his head. Wood then took the gun away from the defendant, dropped it, and then kicked it away. When asked about the disparity in these versions, Wood's response was: "Well, I had said something and the detective stopped the tape and slapped me. So I was just saying pretty much anything so he wouldn't hit me again."

The defendant testified on his own behalf. He said that he had met the victim in church in January of 2002. The victim lived in a homeless shelter, and the defendant said he befriended the victim by providing him items such as toiletries and food. He considered the victim a friend. The defendant, along with Robert Rogers, had picked up the victim on May 17th. All three stayed at the defendant's home that night. The defendant discovered his necklace was missing when he woke up in the early afternoon of May 18th. He went into the living room and told the men there that the necklace was missing and that he wanted it back. The defendant said he suspected the victim had taken the necklace but did not immediately confront him. The defendant later heard Roberts accusing the victim and reentered the living room with the gun in hand. He stated that he was mad and intended to scare the victim. The defendant said that he was yelling and screaming and that he pointed the gun at the victim at times. He said he held the gun at his side, cocking and uncocking it. The defendant stated he never held the gun straight out, aiming at the victim's face. The defendant said the incident caused him to recall a home invasion he had suffered in January of 2002, when his girlfriend was killed. The gun fired while the defendant was looking off to the side, away from the victim. He stated that he dropped the gun and was pushed outside by the group. He said

he could not remember any discussion about placing a knife on the victim or formulating a story to relate to the police.

On cross-examination, the defendant admitted that the victim did not pull a knife or have a weapon on him. The defendant said that he pointed the gun at the victim but did not aim it. He defined "aim" as "standing right in front of him with my arm extended and the gun pointed at him." The defendant asserted that "it just went off on its own."

**Sufficiency**

The defendant claims that the proof was insufficient to support a conviction for second degree murder. Instead, he contends that he was in such a state of outrage at the victim's betrayal of trust that the proof would only sustain, at most, a conviction of voluntary manslaughter. The State argues that the evidence is sufficient to support the conviction. Our review compels us to agree with the State.

The standard for an appellate court reviewing a sufficiency challenge is "whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002); see also Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000); see also Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599.

A verdict of guilt by the trier of fact resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence." Evans, 108 S.W.3d at 236 (citing Bland, 958 S.W.2d at 659). Nor may this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. Evans, 108 S.W.3d at 236-37.

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. See Tenn. Code Ann. §§ 39-13-201, -210(a)(1). A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-302(b).

It is difficult to reconcile the defendant's theory of voluntary manslaughter with his testimony at trial and his statement to detectives. Voluntary manslaughter is the "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). At trial, the defendant testified that he was looking away from the victim when the gun fired. During his interview, the defendant attributed the shooting to the gun's "hair trigger." At trial, he testified on cross-examination that the gun went off on its own.

There was no evidence that the defendant or anyone else attempted to render aid or summon help for the victim. Instead, there was an attempt to stage a scene justifying self-defense by planting a knife in the victim's hand. Furthermore, there was evidence of a discussion by the defendant, with witnesses, of a concocted story to relate to investigators.

The jury was under no obligation to accept the defendant's contentions that the killing was committed in a state of passion or was accidental. A reasonable jury could have justifiably found that the provocation suffered by the defendant, theft of a necklace, was inadequate. In any event, that decision, made under proper instructions and consideration of all the evidence, is within the exclusive province of the jury. There was ample evidence to support the jury's verdict of second degree murder. We, therefore, defer to the rational judgment of the jury and affirm the conviction.

### Sequential Instructions

In his next issue, the defendant contends that sequential jury instructions in this case were unconstitutional because they precluded consideration of the defendant's contention of killing in the heat of passion once the jury determined that the killing was "knowingly" committed. The State responds initially by alleging that, by failing to object to alleged omissions in the instruction, the defendant waived the issue. However, we choose to address the issue on its merits.

The propriety of sequential instructions has been approved by this court in numerous cases. See State v. Augustine John Lopez, III, No. M2003-02307-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 646 (Tenn. Crim. App. at Nashville, June 28, 2005) ; State v. Stanley Earl Cates, No. E2003-02648-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 1126 (Tenn. Crim. App. at Knoxville, Dec. 20, 2004); State v. Joe A. Gallaher, No. E2001-01876-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 552 (Tenn. Crim. App. at Knoxville, June 25, 2003); State v. Rutherford, 876 S.W.2d 118, 119-20 (Tenn. 1995), rev'd on other grounds, 1996 Tenn. LEXIS 484 (Tenn. July 1996); State v. McPherson, 882 S.W.2d 365, 375 (Tenn. Crim. App. 1994); State v. Raines, 882 S.W.2d 376, 381-82 (Tenn. Crim. App. 1994).

Our Supreme Court affirmed this court's approval of sequential instructions and printed that portion of this court's opinion as an appendix in State v. Mann, 959 S.W.2d 503, 517, 521 (Tenn. 1997).

The defendant argues that sequential consideration precluded the jury from considering the evidence of the defendant's theory that he acted in an irrational manner due to adequate provocation. However, the jury, in convicting of second degree murder, had to find a "knowing" state of mind. This element would necessarily involve a consideration of the defendant's rationality, or lack thereof, within the context of "knowing."

We also note that to avoid the potential risk created by a sequential offense consideration instruction, Judge Joseph M. Tipton, in a concurring opinion, State v. Earnest Gwen Humphrey, suggests that:

> When evidence justifies an instruction on voluntary manslaughter, the trial court should instruct the jury so as to ensure adequate consideration of both second degree murder and voluntary manslaughter. That is, if a sequential offense consideration instruction is given, the instruction dealing with second degree murder should also advise the jury relative to the issue of passion upon adequate provocation relative to voluntary manslaughter. Such an instruction is contained in T.P.I.-Crim. 7.05(a) (8th ed. 2004), which provides after stating the elements of second degree murder:
>
> > The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

State v. Earnest Gwen Humphrey, No. M2003-01489-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 924, at *42 (Tenn. Crim. App., at Nashville, Aug. 24, 2005) (Tipton, J., concurring) (citation omitted). We conclude that such an instruction, though not required by precedent, is desirable. We further note that such an instruction was given in this case.

In our view, sequential instructions have firm precedential standing in Tennessee and, further, the jury was not precluded from considering the element of voluntary manslaughter which distinguishes it from second degree murder.

**Sentencing**

In his third issue, the defendant asserts that the trial court erred in sentencing by failing to apply two additional mitigating factors. A defendant's sentence is reviewed by the appellate courts *de novo* with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). For this presumption to apply to the trial court's actions, there must be an affirmative showing in the record that the trial court considered sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999). While determining or reviewing a sentence, the courts must consider: (1) the evidence received at trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence offered by the parties on the enhancement and mitigating factors; (6) any statement the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn.

Code Ann. §§ 40-35-103(5), -210(b); State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991); State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

If the trial court has imposed a lawful sentence by following the statutory sentencing procedure, has given due consideration and proper weight to the factors and sentencing principles, and has made findings of fact adequately supported by the record, this court may not modify the sentence even if it would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). However, if the trial court does not comply with statutory sentencing provisions, our review of the sentence is *de novo* with no presumption the trial court's determinations were correct. State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000).

The defendant was sentenced as a Range I, violent offender with the presumptive sentence being twenty years. The trial court applied two enhancement factors: the employment of a firearm during the commission of the offense and a history of criminal convictions or behavior. The trial court gave little weight to these and enhanced the sentence to twenty-one-and-one-half years. The trial court found mitigating factors existed: the defendant was suffering from a mental condition which reduced his culpability; the defendant assisted the State in arresting and prosecuting the individuals who had previously invaded the defendant's home; the defendant lacked sustained intent to violate the law; the defendant was suffering from post-traumatic stress disorder and grief stemming from the events of his home invasion; and the defendant's stress and grief caused him to react more intensely to the theft of the property by the victim.

Upon finding this "fairly strong mitigating proof," the trial court reduced the sentence to seventeen years. The defendant now complains that the mitigating factors of exhibiting remorse for his actions and fully cooperating with the police should have been applied. These were specifically considered by the trial court in sentencing and rejected. The trial court concluded that the defendant was remorseful about his girlfriend's death from the earlier home invasion and with being charged with this crime but not so at the victim's death. The court noted that the defendant did not immediately confess to this crime and, for a time, attempted to deceive the officers concerning the planted knife on the victim. These actions were not indicative of either remorse or full cooperation.

The record fully supports the trial court's rejection of these mitigating factors. The defendant's original statement to the first officers on the scene was that he acted in self-defense. When questioned by detectives on the night of the shooting, the defendant gave evasive answers concerning the events leading to the victim's death. Although the defendant made assertions of being sorry for the victim's death in testimony and to others, the trial court was best suited to judge the credibility and genuineness of these assertions. We find no error in sentencing and affirm the judgment as rendered.

**Failure to Disclose Evidence**

In the fourth and final issue, the defendant contends that the State withheld impeachment evidence concerning a prosecution witness, Robert Rogers. Specifically, the defendant asserts that

the two items withheld from disclosure were that: (1) the State promised not to prosecute Rogers for contempt so long as he honored a lawfully served subpoena and appeared as a witness at trial; and (2) the State promised not to prosecute Rogers on marijuana possession.

During the new trial motion, the prosecutor testified concerning three conversations he had with Robert Rogers. The first was a phone conversation prior to the preliminary hearing, in which Rogers stated he would not testify due to his fear of the defendant. The prosecutor confirmed that Rogers had been subpoenaed and told him that he would take whatever steps were necessary to secure Rogers's attendance. Later, the prosecutor had Rogers arrested as a material witness and required him to post a bond assuring his appearance. The trial court pointed out that defense counsel was consulted concerning the witness's bond.

The second conversation related by the prosecutor was on the day of jury selection for the defendant's trial. The witness was anxious and wanted to get his testimony over. The prosecutor informed Rogers and the other witnesses to be present the next day to begin the trial. The last conversation the prosecutor and Rogers had was on the second day of trial. The prosecutor was asking him about the events surrounding the shooting. Rogers broke down and began to cry. He told the prosecutor about having taken marijuana behind the defendant's house, burying it, and then later revealing this to police who retrieved it. The prosecutor was unaware of this, and there had been no charges filed concerning the marijuana. The prosecutor assured him that he had no intent to file any charges on the marijuana and that Rogers should not be concerned with it. The prosecutor said that he made no threats to the witness and that the judge had previously warned the witness of the penalty for contempt if he failed to appear for his testimony.

At the new trial motion, the defendant presented a tape recording and transcript of a conversation between Robert Rogers and, apparently, Adam Whitehead. In the conversation, Rogers asserted that the prosecution had threatened him with contempt if he failed to appear as a witness.

The trial court found that the prosecutor had warned the witness about being prosecuted for contempt for failure to appear and had not disclosed this to defense counsel. The trial court went on to find that it was not necessary to disclose this information as it did not affect the witness's testimony. "Any perceived threats of prosecution for contempt for non-appearance, or promises of non-prosecution to reward the witness for his appearance, would have had no effect on the substance of the witness's testimony at trial other than to ensure that his testimony took place."

The landmark case of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), established that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87, 83 S. Ct. 1194. "Evidence favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citations omitted). The State has no obligation to provide information which the defense

"'already possesses or is able to obtain.'" <u>Id.</u> at 56 (quoting <u>State v. Marshall</u>, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992)).

> In order to establish a <u>Brady</u> violation, the defendant must prove four elements:
> (1)    that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
> (2)    that the State suppressed the information;
> (3)    that the information was favorable to the accused; and
> (4)    that the information was material.

<u>Id.</u> at 56.

In this case, the record reflects that the defendant requested the information and that the first element is present. The trial court found that the State did not reveal to the defense that the prosecutor had warned Rogers of possible contempt penalties while acknowledging that the trial court had also warned the witness. Thus, in a technical sense, the second element was established.

In our view, neither the third nor fourth elements of a <u>Brady</u> violation have been shown. The defense, by knowledge of the witness being arrested and being placed on bond, was aware that Rogers was a reluctant witness. That information was available for whatever impeachment purposes the defense desired to use. A warning of contempt penalties by the prosecutor would not advance the information's usefulness.

Likewise, we do not view the suppressed evidence as material. In <u>Kyles v. Whitley</u>, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), the Supreme Court held that materiality does not require a showing that the suppressed evidence would have resulted in the defendant's acquittal, but it does require that the evidence would change the case so as to undermine confidence in the verdict. <u>Id.</u> at 435, 435, 115 S. Ct. at 1566.

In the case at hand, there is nothing to indicate that any of the State's actions were intended to affect the substance of the witness's testimony but were only to ensure his presence. The trial court did not address the issue of leniency in his findings, but the record does not support its presence. Assurance of non-prosecution for a charge that had not been filed and was not known to the prosecutor is not a reward of leniency.

In summary, we conclude that the evidence was of insufficient materiality to either change the outcome of the trial or to undermine confidence in the verdict.

**Conclusion**

After thorough review, we conclude as follows: (1) that the evidence was sufficient to support the conviction beyond a reasonable doubt; (2) that sequential jury instructions are constitutional; (3) that the trial court did not err in sentencing; and (4) the State did not commit <u>Brady</u> violations by non-disclosure. Accordingly, we affirm the conviction and sentence.

_____
JOHN EVERETT WILLIAMS, JUDGE